UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GENE A. TYRRELL,

v.                              Case No. 8:02-cr-111-T-17MAP
                                         8:10-cv-1289-T-17MAP

UNITED STATES OF AMERICA.

_____

O R D E R

This cause is before the Court on Defendant Gene A. Tyrrell's timely-filed amended motion to vacate, set aside, or correct an allegedly illegal sentence pursuant to 28 U.S.C. § 2255 (hereinafter "motion" or "motion to vacate") (D1939; D-cv-12).  A review of the record demonstrates that the motion to vacate must be **denied.**

**PROCEDURAL HISTORY**

On November 16, 2004, a grand jury sitting in the Middle District of Florida returned a second superseding indictment charging Gene A. Tyrrell and others with conspiracy to commit securities fraud, wire fraud, and mail fraud, in violation of 18 U.S.C. § 371, five counts of securities fraud, in violation of 15 U.S.C. § 78j(b) and 18 U.S.C. § 2, three counts

of selling unregistered securities, in violation of 15 U.S.C. § 77e(a) and 18 U.S.C. § 2, thirteen counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2, money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), eight counts of engaging in illegal monetary transactions, in violation of 18 U.S.C. §§ 1957 and 2, and seven counts of laundering of monetary instruments, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2. D-577.

After a three-month trial, a jury convicted Tyrrell of the overarching conspiracy count, one count of securities fraud, seven counts of mail fraud, conspiracy to commit money laundering, and seven counts of money laundering. D981. This Court sentenced Tyrrell to 136 months incarceration. D1087, D1100. Tyrrell directly appealed his conviction and sentence. D1111.

On March 17, 2008, the Eleventh Circuit affirmed Tyrrell's convictions and sentence. *United States v. Tyrrell*, 269 Fed. App'x 922 (11th Cir. 2008). Tyrrell then filed a petition for certiorari, arguing that the ruling in *United States v. Santos*, 553 U.S. 507 (2008), decided after the opinion issued in his direct appeal, affects the validity of his money laundering convictions in "Counts 32-38" because the "proceeds . . . were derived from profits from the underlying criminal enterprise." Exhibit 4 at 1. The Supreme Court denied Tyrrell's petition on June 15, 2009. 129 S. Ct. 2790.

## FACTUAL HISTORY

At trial, co-defendant Danny Wey explained that Millennium Investment, Inc. ("MII") initially had been created to help emerging businesses become publicly-traded companies. D1213 at 249. Wey and co-defendant Gregory G. Schultz served as officers and directors of MII. D1201 at 126-28; see GX 3I at 04991-04992. Wey further explained that Millennium Investment, Inc. Trust ("MIIT") had been established shortly thereafter to market and sell

2

unregistered notes. D1213 at 250. These notes typically matured in eight months and (ostensibly) yielded twelve percent interest, plus a five percent "bonus[.]" D1212 at 172, 190-91; D1217 at 73-74; see GX 25. Funds raised by MIIT were remitted to MII. D1213 at 250-51.

Wey primarily was responsible for identifying the investments in which MIIT would place the funds raised. D1211 at 123-25; D1213 at 75, 241-42; D1232 at 97. Schultz served as legal counsel to the Millennium entities, drafted the MIIT offering documents, and spearheaded MIIT's fund-raising efforts. D1211 at 125-27; D1212 at 184; D1213 at 55, 242.

The MIIT disclosure documents included experience profiles for both Schultz and Wey but did not disclose that Wey had been convicted of federal felony fraud offenses, was on probation when MIIT notes were sold, and had been barred from the National Association of Securities Dealers, Inc. See, e.g., GXs 7A-C; GX 151-1C at MV0065-66; GX 162C at MV0367-68. Moreover, MIIT investors were not otherwise advised of Wey's criminal background. See, e.g., D1196 at 141; D1207 at 58; D1208 at 169-70; D1210 at 273-74; D1219 at 88, 128, 266; D1223 at 252; D1224 at 198, 208; D1225 at 64-65.

When MIIT began its operations, Schultz told Wey that MIIT notes were exempt from state and federal registration requirements under the "commercial note exemption" for notes maturing in less than nine months. D1212 at 216. Soon, however, Schultz became concerned that MIIT could not satisfy the requirements for this exemption and began exploring whether other exemptions, including the "foreign" exemption, also could be used. D1212 at 216-19.

In any event, the organizational document for MIIT, which both Schultz and Wey executed, purportedly invokes this "foreign" exemption. See GX 13 at Court Doc3- 00230.

3

The putative agreement on which this exemption was premised, GX 13 at Court Doc3-00250, however, actually was created more than one year after the January 1997 effective date of the MIIT organizational document, see D1206 at 133, 168. Moreover, the foreign entity referenced in those documents never actually issued or sold any type of security in the United States. D1206 at 139, 145.

Many of the notes MIIT issued included a "banker's acceptance" provision representing that the "Bank of Bermuda Limited, one of the largest banks in the Caribbean basin," would guarantee the notes in the event of default. E.g., GX 151-1B at MV0045; GX 156-1B at MV0197; GX 162B at MV0348. Actually, this bank never had issued a "banker's acceptance" or any other type of guarantee to MIIT. D1207 at 169-73, 177-80. Indeed, neither the bank nor any of its subsidiaries ever had had a relationship with MIIT or any other related individual or entity. D1207 at 171-73, 206-07.

Dean Sinibaldi was MIIT's top salesperson. D1213 at 162. From December 1997 to June 1998, Sinibaldi was involved in 58 MIIT transactions, valued at $1,655,235.68, that purported to be secured by the banker's acceptance provision. D1223 at 102-11; see GX 1H. Sinibaldi specifically assured many investors that MIIT notes were fully secured by the Bank of Bermuda and, consequently, were a completely safe investment. E.g., D1196 at 136; D1210 at 68-69, 83-84, 175, 225; D1219 at 117, 127. Sinibaldi also encouraged several investors to mortgage their homes to raise money to invest in MIIT notes. E.g., D1223 at 285-86; D1224 at 241-42; D1226 at 27-29.

Sinibaldi initially received a commission of up to ten percent of any MIIT investments he placed. D1213 at 165-67, 177; D1225 at 264-65; D1232 at 90. Early on, in an effort to evade securities laws, however, Schultz determined that Sinibaldi's compensation should

be characterized as "consulting or advisory payments" rather than commissions, even though Sinibaldi never provided any marketing or consulting services to the Millennium entities. D1213 at 167-68, 172-78; D1232 at 83, 93-94; see GX 37. From June 1997 through June 1999, Sinibaldi and his company, Delta Financial Services, Inc., received payments totaling $465,234.47 and securities Sinibaldi later sold for almost $85,000 from MII. D1230 at 166-69; see GXs 1R, 1AA.

From October 1996 to July 1999, individuals invested more than six million dollars in MIIT securities. D1230 at 150-54; see GXs 1U, X. In late 1998, MIIT began experiencing cash-flow problems, and by July 1999, MIIT had well over one million dollars in past-due notes. D1213 at 154-55; see GX 35. Even after MIIT began defaulting on its obligations in October 1998, see GX 35, however, the defendants advised new investors that MIIT notes offered "good security" e.g., GXs 128, 129. By the spring or summer of 1999, MIIT had ceased raising funds. D1213 at 75.

The defendants next created the Stonehedge entities, which typically were marketed through individuals in the financial or insurance business, D1226 at 147, ostensibly to provide funding to "established" companies "with [ ] profitable operating histor[ies]" on "the verge of making [ ] public stock offering[s]," e.g., GXs 252I, 253BR at SV0235-38. The Stonehedge offering materials represented that "Stonehedge invests their portfolio in a company called Millennium as its vehicle for making the investments" and assured investors that "[t]he principals of Millennium have over 40 years experience in taking companies public." E.g., GX 253BR at SV0237; see also GXs 207-1E, 207-2E, 257A.

Between August 1998 and November 1999, Joseph Cuciniello incorporated eight Stonehedge entities in Florida. See GXs 1B, 3L-S. Moreover, during September and

October 1999–by which time the defendants were well aware of an ongoing investigation of their fraudulent activities by the Florida Department of Banking and Finance ("DBF"), see GX 22A-C, 62-another seven Stonehedge entities were incorporated in New York, see Gxs 1C, 4A-G.

Cuciniello served as an officer of several of the Stonehedge entities, see, e.g., Gxs 201D-F, 203D-F, 207-1D-F, and was an authorized signor for ten Stonehedge-related bank accounts, see GX 1K. Cuciniello also participated in seminars to train others to market Stonehedge securities. D1228 at 193, 251-55; D1229 at 140-44, 165-67. From March 1998 to April 2001, Cuciniello and his family received more than $850,000 from the Stonehedge entities. D1230 at 244-49; see GX 1Y.

From March 1998 through November 2000, individuals invested more than 12.5 million dollars in the Stonehedge offerings. D1230 at 197-202; see GXs 1V, Y. Up to 33% of the funds invested in Stonehedge securities subsequently were paid out as commissions to those involved in the process. D1227 at 332-54; see, e.g., GXs 57A-B. Indeed, only about 20% of the money raised through the Stonehedge offerings was invested as represented in the Stonehedge offering materials. D1230 at 243-44; see GX 1Y.

Cuciniello introduced co-defendant Robert Phillips to the Stonehedge program in January 1998. D1228 at 169-71. Cuciniello explained that the Millennium entities successfully had been offering a similar program for several years. D1228 at 171-72. In March 1998, Phillips attended a meeting at the Millennium offices in Clearwater, Florida, during which Schultz provided further detail about the Stonehedge program. D1228 at 172-76.

As a result of these meetings, Phillips agreed to market the Stonehedge program

6

through his network of insurance agents, under the name of his Florida-based company, West Coast Distributors, Inc. ("West Coast"). D1228 at 167-68, 177-84; see GXs 42A-C. In return, West Coast received a commission of up to 27% of every Stonehedge investment placed by Phillips's agents. D1228 at 191-92; see GXs 42A, 42C, 57B. In an effort to evade state and federal securities laws, Schultz instructed Phillips that these payments must be characterized as "referral fees" rather than "commissions." D1228 at 185-86, 233; D1229 at 86-87; D1232 at 83.

During the fall of 1998, Phillips recruited Tyrrell, a previous business associate, to sell Stonehedge securities. D1228 at 196-202. Tyrrell had a team of salespeople who worked for him. D1227 at 329. Once Tyrrell became involved in the marketing efforts, the funds invested in the Stonehedge offerings increased dramatically, from approximately $30,000 to $100,000 per month to as much as $1,000,000 per month. D1228 at 202-04. In fact, Tyrrell's sales organization was larger than any other sales organization involved in the Stonehedge marketing effort. D1228 at 23.

After becoming affiliated with the Stonehedge program, Tyrrell often participated in seminars to train new agents to market Stonehedge securities, and he even created a training manual, GX 43, for distribution at these seminars. D1228 at 251-55, 280-85. Tyrrell also was the president, secretary, treasurer, and sole shareholder of one of these entities, The Stonehedge Group, Inc. E.g., GX40J at EHTS17-0515. As such, Tyrrell executed the shares of stock issued in connection with this entity. D1226 at 207-09; see GX 53I. More than $491,000 was raised using this Stonehedge offering, most of which the investors ultimately lost. D1230 at 226-29; see GX 1N.

During the period from March through July 1999, DBF served investigative

subpoenas on MIIT, Sinibaldi, Global Research International, Inc., and several of the Stonehedge entities, seeking testimony and documents. D1203 at 247-54; see GXs 22A-C, 62. Prior to responding to any of these subpoenas, however, the defendants took measures to conceal their fraudulent activities.

For example, the defendants supplemented MIIT investor files with back-dated correspondence, e.g., GXs 101-2G, 102-3G, 106-1H, 127E, advising MIIT note holders that the purported banker's acceptance provision no longer was operative, D1226 at 91-94, 328, 338-39; D1227 at 34. These letters, however, never were actually mailed to MIIT investors. See, e.g., D1196 at 57-58; D1219 at 149-50. The defendants also modified and supplemented Stonehedge investor files to make them appear to comply with applicable state and federal securities laws. D1227 at 36-37.

In October 1999, DBF filed a civil action in Pinellas County, Florida, seeking an injunction and the appointment of a receiver for MII, MIIT, several of the Stonehedge entities, and First Dominion Venture Capital, Inc., and naming as "relief defendants" Schultz, Wey, Cuciniello, and Sinibaldi. D1201 at 160-70. The state circuit court granted DBF the requested injunctive and other relief, D1201 at 171-73; see GX 15AR, and appointed attorney Gary Lipson receiver of the named entities, D1219 at 279.

At that point, the defendants stopped using the Millennium and Florida-based Stonehedge offerings to raise funds but continued their marketing efforts–from Florida–using the New York-based Stonehedge offerings. D1203 at 216; D1226 at 192-94, 204-05. From November 1999 through November 2000, the defendants raised more than 3.2 million dollars using the New York-based Stonehedge offerings. D1230 at 221-25; see GX 1M. Schultz and Cuciniello even opened new Stonehedge-related American Express

8

accounts after Lipson had assumed control of the Florida-based Stonehedge entities. D1230 at 141; see GX 1L.

Despite his efforts, Lipson only was able to raise $254,933.99 selling shares of stock held by the Millennium and Stonehedge entities. D1195 at 51-52; D1222 at 47-51; see GX 85C. Lipson also received a $50,000 civil settlement from Sinibaldi and a few hundred thousand dollars from other sources. D1195 at 52. In the end, Millennium investors lost more than 5.3 million dollars and Stonehedge investors lost more than 11.4 million dollars. D1230 at 252- 53; see GX 1W.

After learning of Lipson's appointment, Phillips continued to market Stonehedge securities for seven weeks. D1228 at 320-25; D1229 at 91-92. Indeed, Cuciniello assured Phillips that the DBF injunction did not prevent him from marketing Stonehedge securities outside Florida. D1228 at 323-24; D1229 at 81. During that period of time, the Stonehedge sales that Phillips and his agents made were processed through Tyrrell's Arizona-based company, Innovative Financial Concepts, LLC ("IFC"). D1228 at 323-26; see GXs 2, 5A. When the injunction remained in place seven weeks later, however, Phillips decided to withdraw completely from the Stonehedge program. D1228 at 321; D1229 at 91-92.

From November 1998 through October 1999, Tyrrell received his commissions from Phillips's company, West Coast, through his company, IFC. D1230 at 210; see GX 1S. After Lipson's appointment, however, Tyrrell began receiving his commissions from the New York-based Stonehedge XII entity through another Arizona-based company his wife recently had registered, TMT Consulting. D1230 at 210-13; see GXs 1S, 4D, 5B. Payments to TMT Consulting typically were remitted to IFC. D1230 at 219-21; see GX 1BB.

Although they raised millions of dollars selling unregistered securities, at no point did

Tyrrell, Sinibaldi, or Cuciniello invest any of their own money in Millennium or Stonehedge securities. D1213 at 185; D1230 at 154-56, 202-04. After the government had rested, Tyrrell argued that the evidence had failed to establish that he had been aware of and had joined in the criminal conduct alleged in the second superseding indictment. D1258 at 16-24.

In response, the government acknowledged that the evidence had been insufficient to support Counts 2, 4, 6-14, 21, and 24-31 as to Tyrrell; but argued that the evidence had been sufficient to support the remaining conspiracy and substantive counts. D1258 at 32-41. This Court granted Tyrrell's motion as to the counts conceded by the government but otherwise denied that motion. D958; D1232 at 9-19; D1258 at 51-52.

At the close of evidence, this Court confirmed that Tyrrell and his codefendants were renewing their motions for judgment of acquittal and renewed all of its prior rulings. D1232 at 166-68. After the jury had returned its verdicts, the defendants advised this Court that they intended to file motions again seeking judgments of acquittal or, alternatively, a new trial. D1236 at 105-06. Tyrrell subsequently filed such a motion, D1018, which this Court denied, D1054.

## THE PRESENT MOTION TO VACATE

On June 7, 2010, Tyrrell filed a section 2255 motion that failed to comply with this Court's local rules. D-cv-1, D-cv-2, D-cv-3. After this Court issued an order instructing Tyrrell to file an amended motion complying with the local rules, Tyrrell filed a second section 2255 motion on July 9, 2010. D-cv-10, D-cv-12. In this motion, Tyrrell argues that his counsel was constitutionally ineffective:

(1) Counsel rendered ineffective assistance by failing to note and argue that Tyrrell never

10

entered into an agreement to commit securities fraud or money laundering, and as such, could not be lawfully convicted of a conspiracy to commit either crime;

(2) Counsel rendered ineffective assistance in failing to note and argue Tyrrell's Count 5 conviction was not for securities fraud, rather aiding & abetting securities fraud, a crime never envisioned by Congress in passing the Securities Act of 1933 or the Securities & Exchange Act of 1934;

(3) Counsel rendered ineffective assistance by failing to note and argue Tyrrell never participated in a scheme to defraud and could not have committed mail fraud, due to counsel's failure to investigate the applicable law pertaining to these legal principles;

(4) Counsel rendered ineffective assistance by failing to conduct an independent investigation of the facts of Tyrrell's case prior to trial by failing to interview Robert Phillips after his plea agreement, which made Phillips a material and relevant witness at Tyrrell's trial;

(5) Counsel rendered ineffective assistance by allowing Tyrrell's defense at trial to proceed to the jury without calling witnesses available to the defense and witnesses material and relevant to the issue of Tyrrell's guilt or innocence;

(5 [duplicate in the 2255 motion]) Counsel rendered ineffective assistance by failing to note and argue that Tyrrell's conviction for money laundering and conspiracy to commit money laundering was barred by the Supreme Court's opinion in *U.S. v. Santos*, 128 S.Ct. 2020 (2008).

(6) Counsel rendered ineffective assistance at sentencing by failing to note and argue that Tyrrell's convictions for money laundering and conspiracy to commit money laundering and 136 month sentence for money laundering offenses were precluded by *Santos*.

In Ground Seven, Tyrrell argues that he is actually innocent of all charges for which he was convicted that were contained the second superceding indictment.

## DISCUSSION

The Sixth Amendment right to counsel is the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). The benchmark for judging any claim of ineffective assistance of counsel, however, is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 688 (1984);

*see also Boykins v. Wainwright*, 737 F.2d 1539, 1542 (11th Cir. 1984). The burden is on the defendant to demonstrate that (1) counsel's performance fell below an objective standard of reasonable professional assistance and (2) the defendant was prejudiced by the deficient performance. *United States v. Cronic*, 466 U.S. 648, 658 (1984).

The reasonableness of counsel's challenged conduct must be judged on the facts of the particular case, viewed as of the time of counsel's conduct. *Devier v. Zant*, 3 F.3d 1445, 1450 (11th Cir. 1993). For performance to be deficient, it must be established that, in light of all the circumstances, counsel's performance was outside the wide range of professional competence. *See Strickland*, 466 U.S. at 690.  Judicial scrutiny of counsel's performance must be highly deferential, and courts "must avoid second-guessing counsel's performance." *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc). "Courts must 'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.' " *Id.* (quoting *Strickland*, 466 U.S. at 689). The defendant's burden in this regard, though not insurmountable, is a heavy one. *See Chandler*, 218 F.3d at 1314. For a petitioner to show deficient performance, he "must establish that no competent counsel would have taken the action that his counsel did take." *Id.* at 1315.

To establish prejudice, a petitioner must demonstrate a reasonable probability that, but for counsel's deficient performance, the result of his trial would have been different. United States v. Greer, 440 F.3d 1267, 1272 (11th Cir. 2006). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Rolling v. Crosby*, 438 F.3d 1296, 1300 (11th Cir. 2006). If the defendant fails to show that he was prejudiced by the alleged errors of counsel, this Court may reject the defendant's claim without determining

whether the counsel's performance was deficient. *Strickland,* 466 U.S. at 697; *Tafero v. Wainwright*, 796 F.2d 1314, 1319 (11th Cir. 1986).

***SANTOS* CLAIM**

In Grounds Five and Six, Tyrrell claims that his counsel was constitutionally ineffective for failing to argue that Tyrrell's convictions for money laundering and conspiracy to commit money laundering were barred by the Supreme Court's opinion in Santos. D-cv-2 at 19. Relying on that plurality opinion, Tyrrell argues that his conviction must be reversed because his counsel at trial or on appeal "never mentioned" the "merger" problem with the federal money laundering statute, as presented in his case. D-cv-12 at 19. Tyrrell further argues this "merger problem" increased his sentence for the very same conduct constituting the underlying criminal violations. Id. at 21. Tyrrell claims that he told his counsel to file supplemental briefing in the Eleventh Circuit after *Santos* was announced and he refused to do so, adding "[c]ounsel refused to represent Tyrrell before the Supreme Court," instead choosing to "abandon" him on the "'merger' issue." Id. Tyrrell admits that he unsuccessfully raised the *Santos* issue in his petition for certiorari. Id. at 20. Tyrrell's belief that Santos grants him relief from his convictions or sentence is unfounded, as his convictions do not stem from gambling charges. Tyrrell cannot fault his counsel for failing to raise an issue that would have been unsuccessful under existing precedent at the time of his trial and appeal or to perceive that a change in the law was forthcoming. Even if Tyrrell could show his argument had merit concerning his claimed "'merger' issue," he fails to address what argument counsel could have raised applying the facts of his case to those in *Santos* and he offers no such argument other than to blame his counsel for "choos[ing] to abandon" him. D-cv-12 at 19. Tyrrell fails to explain to this Court what precisely his

13

"'merger' issue" entails and how such an argument would have produced a different result in the outcome of the proceedings of a non-gambling case. Tyrrell's lack of clarity in Grounds Five and Six dooms his ineffective assistance of counsel claim under *Strickland*.

In *Santos,* a splintered Supreme Court reversed a money laundering conviction, with a plurality holding that the term "proceeds" of specified unlawful activity as used in the money laundering statute meant "profits" rather than gross receipts.[1] 553 U.S. at 520. In *United States v. Demarest*, 570 F.3d 1232 (11th Cir.), *cert. denied*, 130 S. Ct. 421 (2009), the Eleventh Circuit addressed the effect of the *Santos* decision in section 1956 prosecutions. The Eleventh Circuit determined that, because *Santos* is a plurality decision, it has limited precedential value: Three parts of Justice Scalia's four-part opinion are for a plurality of justices, and those parts do not state a rule applicable to this case. When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Justices who concurred in the judgments on the narrowest grounds. The narrow holding in *Santos*, at most, was that the gross receipts of an unlicensed gambling operation were not "proceeds" under section 1956. Id. at 1242 (internal quotations marks and citations omitted).

In *United States v. Jennings*, 599 F.3d 1241 (11th Cir. 2010), the Eleventh Circuit

---

[1] In the wake of *Santos*, Congress in 2009 amended the money laundering statute to define proceeds to include gross receipts of an unlawful activity. 18 U.S.C. § 1956(c)(9): "the term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." Pub. L. 111-21, § 2(f)(1) (2009).

in applying *Demarest*'s analysis of *Santos* in a mail and wire fraud case, explained further:

> This court therefore treats Justice Stevens's opinion [in Santos] as controlling in its narrowest form. As in *Demarest*, here the money laundering charges did not involve receipts from an unlicensed gambling operation. This court has previously defined proceeds as "what is produced by or derived from something . . . by way of total revenue; the total amount brought in." This definition includes receipts as well as profits.

*Id.* at 1252 (footnote omitted). The *Jennings* Court reaffirmed that with the exception of illegal gambling lotteries, its pre-*Santos* definition of proceeds, explained above, still binds the Court when examining any other illegal money laundering activity.

Based on *Demarest* and *Jennings*, *Santos* has no application to this case. The funds Tyrrell laundered were not gross receipts of an illegal gambling operation. Indeed, Tyrrell's convictions were wholly unrelated to any illegal gambling operation. In these circumstances, the narrow holding of *Santos* does not change the state of the law as it relates to Tyrrell's criminal activity and convictions. Further, Tyrrell's complaint that a "'merger' issue" existed is never explained nor does he cite to any controlling authority that lends credence to his claim. Even if he had made such a showing, however, the merger language in Santos bears only on the reasoning for that decision; it does not make Santos applicable to this case.

The evidence showed that Tyrrell must have known that Stonehenge was a sham, given his role in marketing and fund-raising and his direct knowledge that his commissions significantly reduced the amount left for legitimate investments. Tyrrell and his team of salespeople aggressively marketed the plan, dramatically increasing the amounts raised from investors. D1227 at 331, D1228 at 23, 202-04. Tyrrell knew that the scheme differed from the offering materials because he was the national marketing director and received

up to a 27% profit from marketing the plan to others. D1227 at 332. He also traveled nationally to sell the scheme to insurance agents at seminars (D1228 at 209-11, 244, 250-53), distributed materials and binders to new sales agents in order to market the scheme, and created a training manual. D1228 at 251-57, 280-85, 300, GX 46 at RMP026, GX 43. Tyrrell's involvement in the scheme became solidly more entrenched as he assumed the roles of president, secretary, treasurer, and sole shareholder of a Stonehedge Group, Inc., entity and began executing stock shares for the entity. D1226 at 207-09, D1227 at 238, Gxs 53I, 40J at EHTS 17-1515.

His actions ultimately led to a $491,000 loss to the shareholders when he allowed Phillips and his agents to process Stonehedge securities investor monies through his Arizona-based company, Innovative Financial Concepts, LLC ("IFC") while the State of Florida's injunction was in place. D1230 at 226-29, D1228 at 323-26, GX IN 2, 5A, 260B. Tyrrell received commissions through IFC and later through TMT Consulting. D1230 at 210-13, 219-21, Gxs, 1BB, 1S, 4D, 5B. Tyrrell also used TMT to launder the proceeds of the scheme, and paid Phillips with funds directed at a trust. D1228 at 219-220, 234, 323-27, GX 1BB, 70. This concealment and skimming of incoming funds from the investors was sufficient to support Tyrrell's money laundering convictions. *See, e.g., United States v. Farese*, 248 F.3d 1056, 1060 (11th Cir. 2001)  (finding that concealment requirement in section 1956(a)(3)(B), in language identical to section 1956, was satisfied when defendant exchanged large bills for small bills but did nothing else to conceal the illegal nature of the money, as the exchange "facilitate[d] concealment of the 'location' of funds because one large-denomination bill is easier to hide than several small-denomination bills of the same total value"); *United States v. Burns*, 162 F.3d 840, 847-49 (5th Cir. 1998) (affirming section

1956(h) conviction where an ordinary check transfer between two bank accounts conducted in plain view was the final step of a larger money laundering scheme willfully designed to give defendant access to illegal proceeds). Tyrrell's receipt of a significant portion of investor funds as payment for his bogus marketing efforts is a sheer extraction of scheme profits.

Nor was his counsel ineffective for failing to argue *Santos*. An attorney is not required to raise every non-frivolous issue. Indeed, it is an effective strategy to "winnow out" weaker arguments even though they may have some merit. *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983); *Smith v. Murray*, 477 U.S. 527, 534-35 (1986); *Jones v. Burns*, 463 U.S. 745 (1983); *Heath v. Jones*, 941 F.2d 1126, 1131-32 (11th Cir. 1991). Tyrrell has no right to counsel to pursue discretionary review. *See Austin v. United States*, 513 U.S. 5, 8 (1994) (a court-appointed or retained lawyer may only file a certiorari petition to the Supreme Court if there are meritorious grounds for relief). *See also, McNeal v. United States*, 1995 WL 290233, *1-2 (6th Cir. May 11, 1995) (holding that a claim that counsel failed to file a petition for rehearing was not a constitutional violation); *United States v. Ferrell*, 730 F. Supp. 1338, 1340 (E.D. Pa. 1989) (holding that petitioner does not have constitutional right to appeal criminal conviction to the Supreme Court or to have counsel pursue application for review in the Supreme Court); *United States v. Lauga*, 762 F.2d 1288, 1291 (5th Cir.1985) (finding claims of ineffective assistance of counsel because his attorney did not seek a writ of certiorari from the Supreme Court devoid of merit). Furthermore, because the Strickland standard is objective, "[i]t matters not whether the challenged actions of counsel were the product of a deliberate strategy or mere oversight. The relevant question is not what actually motivated counsel, but what reasonably could

17

have motivated counsel." *See McClain v. Hall*, 552 F.3d 1245, 1253 (11th Cir.2008). A movant can prevail under the second prong of *Strickland* only if he can "affirmatively prove prejudice" by showing that counsel's errors "actually had an adverse effect on the defense.'" 466 U.S. at 693. Tyrrell has not done this. Tyrrell's interests were amply represented at trial and on direct appeal. Tyrrell has failed to establish a violation of his constitutional rights for raising a *Santos* claim at trial or on direct appeal and he fails to make any argument to establish such a violation in this motion. Consequently, grounds five and six do not warrant relief.

## TRIAL STRATEGY

In Ground Three, Tyrrell faults his counsel's trial strategy by claiming counsel did not investigate the applicable law relating to his mail fraud charges and therefore did not argue that there was no proof that Tyrrell engaged in certain specified conduct; rather, per Tyrrell's filing, his counsel chose to defend Tyrrell by arguing a lack of knowledge by Tyrrell of the ongoing scheme to defraud. D-cv-12 at 8, D-cv-12-1 at 10-12. Tyrrell contends that had counsel engaged in a "cursory investigation of the law applicable to mail fraud[, ]" counsel would have known to argue that the government's proof was lacking, in that, there was no proof that Tyrrell actually mailed certain items. Id.

In Ground Four, Tyrrell again faults his counsel for failing to investigate the facts of his case independently and for failing to interview co-defendant Robert Phillips after Phillips had signed a plea agreement. D-cv-1 at 9. Tyrrell claims Phillips would have been a "material and relevant" witness in his defense if his counsel had "confronted" Phillips "with the proper questioning." Id. Tyrrell makes several other references to Phillips' testimony such as "Phillips testified he committed no crime with Tyrrell" and "he testified he did not

conspire to commit securities fraud, nor money laundering, nor conspiracy to launder money, nor any other crime with Tyrrell" Id. at 9. Tyrrell says Phillips did not become suspicious of "what he did for Stonehedge might have been criminal" until he received his grand jury target letter. Id.

In Ground Five, Tyrrell argues that his counsel was ineffective because he failed to call a single witness, even though several witnesses were available to testify on Tyrrell's behalf. D-cv-12 at 13-18. Tyrrell claims "his co-workers, and all connected with his business" "would have testified[ ] that [he] never committed an illegal act in his life, save and except a few traffic violations." Id. at 13. Tyrrell offers many "theories" to challenge his counsel's trial strategy. Tyrrell, vaguely and without any affidavits or other factual support, cites to his wife's company being legitimate; his Chief Financial Officer Howard Chessin not being charged in this case; his Office Manager Georgia Mager's knowledge of his company's paperwork; his partner, Bill Bazen's belief that he was innocent; his training manager, Pat Green's knowledge concerning a lack of illegality associated with the seminars; his CPA Robert Korljan's knowledge that he "never committed a financial crime"; and lastly how his own testimony would have shown that he "was a bona fide successful businessman" as examples of testimony Tyrrell believes would have, if presented to the jury, rebutted the government's evidence. Id. at 13-14.

In succeeding pages, Tyrrell further challenges the sufficiency of the evidence leading to his conviction by attempting to sanitize and minimize his activities, an issue he previously lost on direct appeal. Id. at 15-18. Tyrrell's complaint about his counsel's trial strategy and his fervent belief that the jury would have found him innocent is misplaced. Nothing in the record indicates that he was anything but guilty of the charges he was

convicted of and the sufficiency of the evidence presented at trial has been examined by the Eleventh Circuit who held "an abundance of evidence adduced at trial proved Tyrrell's knowing and voluntary participation in the charged conspiracies." *Tyrrell,* 269 Fed. App'x at 936. Tyrrell's post-conviction attempts to minimize his criminal behavior by blaming counsel are unpersuasive. None of the legal theories he now espouses nor the witnesses he references, even if they had testified as he now claims, or any further investigation, would have revealed Tyrrell to be actually innocent of the charges in this case or led to a different result.

Attorneys generally are not considered to be constitutionally ineffective because of tactical decisions or strategies. *Solomon v. Kemp*, 735 F.2d 395, 402 (11th Cir. 1984); *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983) (even if, in retrospect, the strategy may have been wrong, counsel's decision to employ the strategy is not ineffective if it was not so patently unreasonable that no competent attorney would have chosen it). Whether to present certain testimonial evidence is a matter of trial strategy, and complaints of uncalled witnesses generally are disfavored. *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978). Tactical decisions made by counsel do not render assistance ineffective merely because in retrospect it is apparent that counsel chose the wrong course. *Adams v. Balkcom*, 688 F.2d 734, 739 (11th Cir. 1982); *see also Alexander v. Dugger*, 841 F.2d 371, 375 (11th Cir. 1988). Thus, a court deciding an ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. *Strickland*, 466 U.S. at 690. The inquiry this Court must conduct is not whether counsel's specific acts were wrong, but whether some reasonable lawyer might have acted similarly. *Chandler*, 218 F. 3d at 1314-15 n. 15. This

Court must presume that counsel's strategy was reasonable unless the petitioner demonstrates that counsel's strategy was unreasonable. Id. at 1318.

Furthermore, "a petitioner must establish that no objectively competent lawyer would have taken the action that his lawyer did take." *Chandler*, 218 F.3d at 1315. "[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

As a general rule, "counsel's failure to call certain witnesses is not sufficient grounds for a Sixth Amendment claim." *United States v. Hughes*, 635 F.2d 449, 453 (5th Cir. Unit B Jan. 1981). The Eleventh Circuit has made clear that the decision to present testimonial evidence is a matter of trial strategy. *See Waters*, 46 F.3d at 1512.

Counsel's failure to call particular witnesses that the defendant thinks would be helpful to him is generally not considered ineffective assistance of counsel. *See Hardwick v. Crosby*, 320 F. 3d 1127, 1161 (11th Cir. 2003). Instead, it is regarded as a tactical decision. *Id*. "Which witnesses to call, and when to call them, is the epitome of a strategic decision." *Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004) (quoting *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995)). Strategic decisions rendered by counsel after a complete review of relevant laws and facts are "virtually unchallengeable." *Strickland*, 466 U.S. at 690-91.

Primarily, Tyrrell is challenging counsel's tactical and strategic decisions in presenting his defense. As discussed above, this Court must presume that counsel's strategy was reasonable unless Tyrrell demonstrates that it was unreasonable. Counsel

21

may have decided that factors such as the witnesses' truthfulness, demeanor, ability to communicate, criminal history, and impression on the jury militated against calling them. Given that Tyrrell's defense was based on a claimed lack of knowledge concerning the fraud, counsel may reasonably have decided to present as little connection as possible between Tyrrell and his co-defendants. In addition, Tyrrell has not attached any affidavits or other evidence that any of these individuals would in fact have testified on his behalf. The conclusory statements Tyrrell makes do not constitute an offer of proof as to the witnesses's expected testimony. Nor has he shown how Phillips' testimony would have benefitted his defense had his counsel interviewed Phillips prior to trial, especially given Tyrrell's own personal knowledge of Phillips' involvement in the scheme and Phillips' availability to be cross-examined at trial. None of Tyrrell's assertions lead to a rational and a credible belief that the trial result would have been different had counsel performed as Tyrrell now suggests.

Tyrrell's unsupported contentions the he, his wife, or any of his employees or business associates could have provided additional facts to support his lack of knowledge defense fails to meet *Strickland*'s prejudice prong because "mere speculation that missing witnesses would have been helpful is insufficient to meet the petitioner's burden of proof." *Streeter v. United States*, 335 Fed. App'x 859, 864 (11th Cir. 2009) (citing *Johnson v. Alabama,* 256 F.3d 1156, 1187 (11th Cir. 2001)). Tyrrell's second claim that he wished to testify and counsel dissuaded him from doing so is belied by the record. The transcript of the trial refutes this claim. D1232 at 80-81. Furthermore, Tyrrell offers no explanation why, if he wished to testify or present witnesses as he now claims, he did not say so at trial. In fact, the record reflects that he chose not to present a case and, instead, chose to rely on

his presumption of innocence:

> COURT SECURITY OFFICER: Jury present in the courtroom, Your Honor.
>
> THE COURT: The jury is in the box, correct, Mr. Bailiff?
>
> COURT SECURITY OFFICER: Yes, Your Honor.
>
> THE COURT: You may be seated, ladies and gentlemen of the jury. You may be seated in the courtroom.
>
> Good afternoon ladies and gentlemen of the jury. My standard inquiry you've complied with the standard instruction; correct? Correct. Everybody and no matter what time of day you come in you run into traffic isn't it wonderful to live in this area?
>
> All right. Now, ladies and gentlemen you have had abundant amount of time to rest. And I expect that you have done so my fellow judges, so you are prepared to proceed forward.
>
> As you will recall when you were here the other day, the Government announced rest. Completion of the Government's case in chief and now we'll go forward and make inquiry of the respective defendants. I remind you there's no obligation for a testify to do anything, to make any presentation what so ever. If the Defendant elects to do so, he may do so.
>
> * * *
>
> What is the pleasure of the Defendant Tyrrell, Mr. Musilli?
>
> MR. MUSILLI: Thank you, Your Honor. My client will rest. And rely on his presumption of innocence.
>
> THE COURT: All right. And you will allow us to reserve motion at this time?
>
> MR. MUSILLI: That's correct, Your Honor.

D1232 at 80-81.

While Tyrrell in hindsight may wish that a different tack had been taken at trial, the fact is that his counsel's decisions on which witnesses to call, if any, were the kind of informed strategic choices that are unassailable in a section 2255 proceeding. Other than

his current statement, Tyrrell never represented to this Court he desired to testify on his own behalf. By failing to provide any evidence and offering nothing but a self-serving theory of defense, Tyrrell's arguments are unpersuasive under a *Strickland* analysis and are meritless. Moreover, the record shows counsel presented a logical, sound defense for Tyrrell. Thus, there is no merit to Tyrrell's claims.

In sum, Tyrrell's counsel did not render constitutionally ineffective assistance with respect to the grounds raised herein. As Tyrrell has failed to meet both *Strickland* prongs, his claims of receiving ineffective assistance of counsel must be denied.

## ACTUAL INNOCENCE CLAIM (GROUND SEVEN)

Tyrrell asserts in Ground Seven that the evidence revealed that Tyrrell was actually innocent of the charges for which he was convicted. D-cv-12 at 22-23. Tyrrell's arguments are belied by the abundance of evidence admitted during trial that proved his guilt. As Tyrrell offers no coherent argument to the contrary, his claim of actual innocence must therefore be summarily rejected.

## SUFFICIENCY OF THE EVIDENCE

In Ground One, Tyrrell argues that his trial counsel was ineffective "for failing to note and argue that [he] ever entered into an agreement to commit securities fraud or money laundering" and essentially challenges the sufficiency of the evidence as to his conspiracy conviction. D-cv-12 at 5. In this ground, Tyrrell cites to no specific prejudice by counsel other than "counsel's failure to research the applicable law" prior to trial. Id.

Similarly, in Ground Two, Tyrrell claims his counsel was ineffective for failing to argue that the evidence underlying Count Five led to a variance because aiding and abetting securities fraud rather than securities fraud was proven at trial. D-cv-12 at 6.

Tyrrell claims "counsel failed to argue anything" and his "[c]ounsel never put on a defense to the charge of aiding and abetting securities fraud." Id. Both of these contentions lack merit and are refuted by the record in this case.

On appeal, Tyrrell's counsel challenged the sufficiency of the evidence claiming that "[t]he evidence adduced at Trial did not include any direct or circumstantial evidence of Mr. Tyrrell's knowing participation in an agreement to defraud." *Tyrrell,* 269 Fed. App'x at 936. The Eleventh Circuit rejected that contention, noting "an abundance of evidence" supported the convictions, and upheld this Court's previous rulings denying Tyrrell's motions for judgments of acquittal, or in the alternative, new trial. *Id.* In his motions for judgment of acquittal, Tyrrell raised numerous challenges to the government's evidence and this Court, citing the evidence, held, in pertinent part: "After considering all of the direct evidence and all of the nature of the conspiracy, and the fact that Tyrrell knowingly collected overrides from agents he recruited, who did make sales, and those commissions were in excess of the offering documents, and the fact that Tyrrell continued to do business after the State of Florida intervened. After considering all that, the Court believes there is sufficient evidence to deny the Motion for Judgment of Acquittal as to the remaining counts." D938, D1017, D1018, D1231 at 109-113, D1232 at 10-13.

Even if counsel had expanded his argument to include the precise argument Tyrrell advances here, a complaint that there was a material variance between the allegations in the Indictment and the facts established at trial, he is incorrect. To prevail on such a claim, Tyrrell must show that (1) there was a material variance, and (2) that he suffered prejudice as a result of the variance. *See United States v. Prince*, 883 F.2d 953, 959 (11th Cir. 1989). Tyrrell has done neither. There is no material variance of the sort that Tyrrell suggests,

25

because, for example, Tyrrell was charged under both a substantive count, 18 U.S.C. §
1341, and 18 U.S.C. § 2, aiding and abetting in Counts Ten Through Twenty-Two. Under
an aiding and abetting theory, the evidence need not demonstrate that Tyrrell actually had
personally participated in every act that was executed in furtherance of the scheme, only
that he knowingly had associated himself with and assisted in the illegal conduct. *See
United States v. Twitty*, 107 F.3d 1482, 1491 n.10 (11th Cir. 1997) (under section 2,
defendant is guilty as a principal if he aided and abetted another in committing bank fraud);
*accord United States v. Broadwell*, 870 F.2d 594, 608 (11th Cir. 1989). Without a showing
of material variance, Tyrrell has not suffered prejudice. In short, Tyrrell's claim lacks merit
and must be denied.

**TYRRELL'S REPLY**

Tyrrell's arguments in his reply are not persuasive.

Accordingly, the Court orders:

1. That Tyrrell's motion for leave to reply to the Government's response providing
the trial exhibits (Doc. 32) is denied.  A 28 U.S.C. § 2255 motion is a motion in a criminal
case.  The fact that this Court opens and maintains a separate civil file for statistical and
tracking purposes does not change that fact that the motion to vacate is related to the
criminal trial and exhibits.

2. That Tyrrell's 28 U.S.C. § 2255 motion to vacate (D1939; D-cv-12) is denied.  The
Clerk is directed to enter judgment against Tyrrell and to close this case.

**CERTIFICATE OF APPEALABILITY AND**

**LEAVE TO APPEAL IN FORMA PAUPERIS DENIED**

IT IS FURTHER ORDERED that Defendant is not entitled to a certificate of

appealability. A prisoner seeking a motion to vacate has no absolute entitlement to appeal a district court's denial of his motion. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue ⋯ only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, Defendant "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further, ' " *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Defendant has not made the requisite showing in these circumstances. Finally, because Defendant is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

ORDERED at Tampa, Florida, on January 28, 2011.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

AUSA: Jay G. Trezevant
Gene A. Tyrrell